UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06CR476 SNL |
| ) | |
| LEOBARDO B. BARRAZA, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the Defendant's motion to suppress evidence and statements [Doc. #27] on June 5, 2008.

Based upon the evidence adduced at the evidentiary hearing, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

On about September, 1998, Maria Eloiza and her five year-old son, Jesus Ramirez, were reported missing from their home in Prospect Heights, Illinois, a suburb of Chicago. Because of this, Det. Mark Porlier of the Prospect Heights Police Department was assigned to investigate the disappearance. His investigation determined that the Defendant Leobardo Barraza was the last person to see Eloiza and her son before their disappearance.

On November 12, 1998, the bodies of Eloiza and Ramirez were found in a rural area near Stanton, Missouri, which is in the Eastern District of Missouri. The medical examiner determined

that Eloiza's cause of death was from strangulation, and that her son, Jesus Ramirez, was killed by blunt force trauma. Both deaths were ruled to be homicide.

During this time, the Defendant Leobardo Barraza and another individual became the main suspects in the murders. For almost eight years after the murder, no one was charged with this crime. Eventually in 2006, the case was assigned to a felony review unit of the Cook County State's Attorney's Office, which unit, along with other duties, investigates "cold cases." After an investigation, on July 26, 2006, an investigator for the Franklin County Prosecuting Attorney's Office, which is the county in which Stanton, Missouri is located, working in conjunction with the Cook County State's Attorney's Office and the United States Attorney in the Eastern District of Missouri, filed a complaint for an arrest warrant to arrest the Defendant for kidnaping Eloiza and Ramirez in the State of Illinois, and transporting them to Franklin County, Missouri, where they were murdered. The affidavit filed in support of the complaint stated that the Defendant admitted in detail to his participation in the murders of Eloiza and Ramirez, making the admissions to his friends and acquaintances. Further, the affidavit stated that the cause of death determined by the medical examiner as to each victim was consistent with the manner in which the Defendant told third parties that the victims were murdered. Based on the above affidavit, a United States Magistrate Judge in the Eastern District of Missouri issued a warrant for the arrest of the Defendant. Investigation by members of the Cook County State's Attorney's Office and the Prospect Heights Police Department determined that the Defendant was living in Colorado Springs, Colorado, and was on probation in the State of Colorado.

Because of this, arrangements were made by the United States Marshals Office in the District of Colorado, and investigators from the Cook County State's Attorney's Office to have the U.S.

Marshals arrest the Defendant on his final visit to his state probation officer before his probation expired. On July 27, 2006, the Defendant arrived for his final visit with his probation officer in Colorado Springs, and was immediately arrested by U.S. Marshals pursuant to the arrest warrant issued in the Eastern District of Missouri.

After the Defendant's arrest, he was conveyed to the Marshals' office in Colorado Springs. Once the Defendant was at the Marshals' office, he was interviewed by Assistant State's Attorney Thomas Maher from Cook County about the offense for which he was charged. Prior to the interview commencing, the Defendant was fully advised of his rights by Maher. The Defendant was asked after each individual right was given to him if he understood his rights, and the Defendant stated he understood them. In addition to the standard <u>Miranda</u> warnings being given to the Defendant, he was also told that he would be charged and tried as an adult for any crime that he had committed during the abduction of Eloiza and Ramirez. He was informed of this last right because in August, 1998, the Defendant was sixteen years-old and was a minor in the State of Illinois. At the time of the interview by Maher in this case, the Defendant was twenty six years-old. After the Defendant was advised of his rights and stated that he understood them, he agreed to talk to the officers.

Prior to the beginning of the interview, Maher asked the Defendant if he knew why he was arrested and brought to the Marshals' office. The Defendant stated that he believed it was because of the disappearance of the woman and the boy from Chicago. The interview was conducted mainly by Maher, but Det. Porlier and Det. John Duffy, an investigator for the State's Attorney's Office, were also in the room. During the interview, the Defendant admitted his involvement in the kidnaping and murder of Eloiza and Ramirez. The tone of the interview was conversational, with Maher asking

3

questions and the Defendant answering them. The interview took place in English, and the Defendant answered all questions appropriately. The Defendant had no trouble conversing with Maher. Although the Defendant's first language is Spanish, the evidence at the hearing showed that the Defendant had been in the United States since the age of eight, and had gone to grade school and three years of high school in the suburban Chicago public schools. During the interview, the Defendant was not threatened in any way nor was he promised anything in return for his statement. The interview, according to Maher, was quite cordial, and the Defendant was cooperative. This initial oral interview with the Defendant in which he admitted all the details of his involvement in the kidnaping and murder took approximately forty minutes to complete. After this oral statement was completed, Maher told the Defendant that he would like to record the statement. He told the Defendant that, if he wanted to, he could either record the statement on video tape or the Defendant could participate in a written statement. In the written statement, Maher explained to the Defendant that he would ask the Defendant questions and write down in longhand the Defendant's answers. After this process was completed, Maher told the Defendant that he would be allowed to go over the written statement and make any changes and corrections that he wished to the statement. Maher also told the Defendant that if he so desired, he could sign the statement. Defendant told Maher that he would rather make a written statement than a video-taped statement.

In furtherance of making the written statement, Maher asked the Defendant if he wanted to make the statement in English as he had been speaking to Maher. The Defendant stated that if he was going to make a formal written statement, he would feel more comfortable if he had an interpreter.

4

When the Defendant requested an interpreter, Maher contacted the deputy marshals who were in the building, and they in turn contacted the Colorado Springs Police Department in order to obtain the services of an interpreter. While they waited for an interpreter, Maher asked the Defendant if he would like something to eat. When the Defendant indicated that he would, in fact, like to eat, food and drink was obtained from a nearby McDonald's, and the Defendant and Maher ate.

After approximately forty-five minutes, Officer Adam Sandoval of the Colorado Springs Police Department arrived at the Marshals' office. Sandoval is fluent in Spanish, having learned to speak Spanish in his home at an early age, and also having taken the subject both in high school and in college. Sandoval participated in numerous translations of all types for the police department over the past several years, including interpreting statements made by defendants as well as those made by witnesses. Sandoval was not aware of any of the details surrounding the current investigation, and it is his practice not to become familiar with details of investigations, but only to act as an interpreter.

Prior to any formal statement being taken, Sandoval advised the Defendant of his full Miranda rights in Spanish. After each right, Sandoval asked the Defendant if he understood that right, and the Defendant stated that he did understand the right. Sandoval also asked the Defendant if he wished to talk to him regarding the event, and the Defendant stated he would make a statement to Sandoval, and waived his rights. Initially, Sandoval translated Maher's questions to the Defendant into Spanish, and the Defendant's answer in Spanish back into English so Maher could understand what the Defendant was saying. In this manner, Maher, Sandoval, and the Defendant went through the Defendant's entire statement orally in Spanish as Maher had previously individually done with the Defendant in English. The Defendant's oral statement was exactly the same in Spanish as it had been earlier to Maher in English. After this oral statement, Maher then prepared a written statement by,

5

again, asking questions of the Defendant in English, having them translated by Sandoval into Spanish, and having Sandoval translate Defendant's answers back to him in English. During the written statement, Maher would write out in longhand in English the Defendant's responses to the questions propounded to him in Spanish by Sandoval. After the statement was completed with Maher paraphrasing the Defendant's words in writing, the Defendant, Sandoval, and Maher went over the statement and the Defendant was allowed to make corrections and changes to the statement. After this, the Defendant signed each page of the statement as well as the end of the statement. The entire process of taking the oral statement and the written statement took approximately an additional one and a half to two hours. Again, the Defendant was not threatened or promised anything during this time period, and the conversation was, in the words of Sandoval, professional and cordial. The Defendant told Sandoval that he had been treated well by Maher and the Marshals from the time of his arrest to the end of the interview.

**Conclusions of Law**

A. The Arrest of the Defendant

Based on the above, the undersigned concludes that the arrest of the Defendant Leobardo Barazza was lawful. Police officers may arrest a person with or without a warrant if they have probable cause to believe that the person arrested committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964), All that need be shown for an arrest to be lawful or an arrest warrant to be issued is that there is a "fair probability" that a crime has been committed and that the defendant committed the crime. See Illinois v. Gates, 462 U.S. 213, 232 (1983). Based on the above law, the undersigned concludes that the United States Magistrate Judge had ample probable cause for the issuance of a warrant to arrest Barraza for kidnaping and murder. The affidavit filed

before the magistrate judge showed that the Defendant made detailed statements to third parties including acquaintances and friends detailing the transporting of the two victims across the state line and their murder by the Defendant and another individual in Missouri. These statements to numerous third parties were corroborated by the medical examiner's report which showed that the two victims were murdered in a manner consistent with the Defendant's statements to third parties. Therefore, based on the above, there was at least a "fair probability" that the Defendant had committed the crime of transporting the victims in interstate commerce and thereafter killing them. Therefore, the arrest was lawful. See Illinois v. Gates, supra

B. The Defendant's Statements

Based on the above, the undersigned concludes that the Defendant's statements were voluntarily made after the Defendant was fully advised of his rights and knowingly waived those rights by agreeing to talk to and make statements to the law enforcement authorities in this case. The evidence shows that the Defendant was fully advised of his Miranda warnings by Maher, and stated that he understood each individual warning as it was explained to him. In addition, the Defendant agreed to talk to Maher and make a statement after being advised of his rights and stating that he understood his rights. This advice was given prior to any questioning of the Defendant and prior to his first oral statement. In addition, after the initial oral statement, the Defendant was again fully advised of his rights in Spanish by Officer Sandoval, stated he understood his rights, and specifically waived his rights, again, before answering Sandoval's questions in Spanish. The record also shows that the Defendant was again advised of his rights a third time, just prior to making the written statement, and again, specifically waived his rights by agreeing to make the written statement. Thus, the record shows that the Defendant's rights were scrupulously adhered to, and he was advised of

7

his rights on at least three occasions, specifically waiving his rights on each of these occasions. Miranda v. Arizona, 384 U.S. 436, 467, 475 (1966); North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1986).

The Defendant also appears to allege at the hearing that because the Defendant had just been terminated from his state probation there is, therefore, an affirmative duty on the part of the police to determine if the Defendant was represented by an attorney on this matter, and that he should not have been questioned without this attorney being present. First, the undersigned notes that there was no evidence presented at the hearing as to what type, if any, representation the Defendant had in his recently concluded probation. The Defendant does not allege or show that he was represented by any attorney at the time he was being questioned in Colorado Springs. What is clear is that the Government showed, without contradiction, that the Defendant was advised of his right to have an attorney present on at least three separate occasions, and waived this right. In United States v. Cristobal, 293 F.3d 134 (4th Cir. 2002), the Defendant was questioned by police authorities after an attorney had been appointed for him by a judge. In determining that there was no affirmative duty on the part of the police to inform the defendant of this fact, the Court stated as follows:

> Cristobal also claims that his waiver was invalid because the morning of the interview, the court had, on its own, appointed counsel to represent him and he was not notified of counsel's existence, nor was his counsel notified of the interrogation. The evidence shows that Agent Swann was not aware that the court had appointed counsel. However, because Cristobal's voluntary decision to speak was made with full awareness and comprehension of his *Miranda* rights, the waiver was valid, even if it could be shown that the police knew counsel had been appointed and concealed that fact from Cristobal. Moran v. Burbine, 475 U.S. 412, 423-24. . .

United States v. Cristobal, 293 F.3d 134, 143 n. 10. See also, Matney v. Armontrout, 956 F.2d 824 (8th Cir. 1992).

Therefore, the undersigned concludes that even if it had been shown that the Defendant was represented by an attorney in the probation matter or otherwise (which it was not), the undersigned concludes the waiver was nonetheless valid.

Further, the undersigned concludes that based on the totality of the circumstances, the Defendant's statements were voluntarily made. See United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990). In commenting on the appropriate test for voluntariness in situations such as this custodial interrogation, the Court stated as follows in United States v. Kilgore, 58 F.3d 350, 352 (8th Cir. 1995).

> The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's "'will [was] overborne and his capacity for self-determination critically impaired.'" . . .In making this determination, courts will inquire into the totality of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist any pressure. . .

58 F.3d 350, 353. Further, the fact that the Defendant was fully advised of his rights and waived his rights weighs heavily in favor of voluntariness. In Evans v. Dowd, 932 F.2d 739 (8th Cir. 1991), police officers falsely told a defendant there was an eyewitness of him committing the crime. Yet, the Court upheld the voluntariness of the confession stating as follows:

> Here, the warnings were part of the totality of the circumstances and, thus, it would be difficult to conclude that police coerced the confession while at the same time warning Evans that he need not say anything.

932 F.2d at 742.

Based on the above law, the undersigned concludes that under the totality of the circumstances, the Defendant's statements were voluntarily made. Although the Defendant claims that he was not told that he would be tried for the murder in this case, the undersigned concludes that it is clear from the record that the Defendant was well aware that he had been arrested because of his

involvement in the disappearance and death of the two victims. When Maher, at the beginning of the interview, asked the Defendant why he was present, he told Maher that he knew it was because of the disappearance of "the woman and the boy." Thus, the undersigned concludes that the Defendant was not misled as to why he was being questioned. In addition, the record shows that the interview in this matter was low-key, and that the Defendant was treated with respect. He was not threatened in any way nor was he promised anything. Voices were not raised, and the Defendant was not physically harmed, coerced, or pressured in any way. Although the interview lasted for some period of time, there were breaks during the interview, and the Defendant was allowed to go to the bathroom, and was given food and drink. For at least a forty-five minute to one hour period of time, there was no questioning while the Defendant ate and the parties awaited the arrival of an interpreter. In addition, according to the witnesses, the Defendant evidenced a totally cooperative demeanor, and of course, he was advised of his rights on three separate occasions and waived his rights. Therefore, based on the above, the undersigned concludes that the Defendant's will was not overborne, and that his statements were voluntarily made. See Miranda v. Arizona, 384 U.S. 436, 467, 475 (1966); Moran v. Burbine, 475 U.S. 412 (1986).

**Conclusion**

Therefore, the Defendant's motion to suppress evidence and statements should be denied.

* * *

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion of Defendant to Suppress Evidence and Statements [Doc. #27]be **denied**.

Further, the parties are advised that they have until July 18, 2008, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

                                                                  /s/ Terry I. Adelman
                                        UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of July, 2008.